(C. D. 1611)

DALTON COOPER, INC.
MEADOWS WYE & CO., INC. } *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 22, 1954)

*Barnes, Richardson & Colburn* (*Harry A. Le Bien, James F. Donnelly*, and *E. Thomas Honey* of counsel) for the plaintiffs.
*Warren E. Burger*, Assistant Attorney General (*Dorothy C. Bennett*, trial attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

EKWALL, Judge: In this case, the importer seeks recovery of customs duties assessed and collected upon an importation of settled lime juice from Dominica, British West Indies, and entered at the port of New York.

Assessment was made under the provision for fruit juices, not specially provided for, at 20 cents per gallon under paragraph 806(a) of the Tariff Act of 1930, as modified by General Agreement on Tariffs and Trade, T. D. 51802 and T. D. 51939.

Plaintiffs claim it is dutiable under the provision for lime juice "unfit for beverage purposes" in paragraph 48 of the same act, as modified by T. D. 51802.

The pertinent provisions of the tariff act, as modified, *supra*, are as follows:

[PAR. 806.]  (a)  Cherry juice, prune juice, or prune wine, and all other fruit juices and fruit sirups, not specially provided for:
Containing less than one-half of 1 per centum of alcohol * * * 20¢ per gal.

[Par. 806.] (b) Concentrated juice of citrus fruits, fit for beverage purposes, and sirups containing any of the foregoing, all the foregoing, whether in liquid, powdered, or solid form:

Lime juice, 20¢ per gal. on the quantity of unconcentrated natural fruit juice contained therein as shown by chemical analysis.

[Par. 48.] Juice of lemons, limes, oranges, or other citrous fruits, unfit for beverage purposes, 1¼¢ per lb.

Over objection of counsel for the Government, the records, exclusive of the invoices, in the cases of *Walker Services* v. *United States*, 28 Cust. Ct. 109, C. D. 1395; *Von Laer* v. *United States*, 8 Cust. Ct. 517, Abstract 47184; and *Walker Services* v. *United States*, 21 Cust. Ct. 218, Abstract 52607, were incorporated in the present case.

In the incorporated cases, the court held the settled lime juice there involved to be "unfit for beverage purposes." It consisted of raw lime juice, which the evidence disclosed was filtered after importation in order to make it more attractive for sales purposes. It was then sold for beverage purposes. The court found that in the condition as imported it was unfit for beverage purposes.

Plaintiffs introduced the testimony of two witnesses in the instant case, the assistant chief chemist in the United States Customs Laboratory at New York and Jeanne Garr, the president of the importing corporation, one of the plaintiffs herein. There was also produced by the plaintiffs, and admitted in evidence as exhibit 1, the report of analysis of a sample of the instant merchandise. No sample of the commodity involved is before the court.

On behalf of the Government, two witnesses were introduced, Mr. Arthur Schwartz, the general manager of the American Lime Corp., and Examiner Joseph Seikel, the United States examiner of the instant lime juice.

Plaintiffs' witnesses were not interrogated as to whether the instant lime juice and that involved in the incorporated cases, as represented by the samples therein, were comparable.

Plaintiffs rely, apparently, upon the testimony of the Government chemist as to the comparability of the analyses involved in the incorporated cases with that in the instant case. The statement is made in plaintiffs' brief that "The juice is comparatively the same as that analyzed and reported in the" incorporated cases. We do not so understand the testimony, which we set forth as follows:

Q. Are the chemical reports, taking into account this variation, comparatively or substantially the same?—A. I would say they are comparatively the same for the things that they show.

Q. I now show you Plaintiffs' Exhibit 1 in this case, which is the chemical analysis of the present importation before the court, and ask you to examine the three.—A. I have.

Q. Again taking into account the variations which occur in a natural product, are these three reports, the chemical analyses, comparatively or substantially

the same?—A. I would say that in the total solids they are comparatively the same. One of the reports shows ash, as does the laboratory report in the New York laboratory, Exhibit 1, and that is comparatively the same.

JUDGE EKWALL: What is comparatively the same?

THE WITNESS: The ash. Only one of the other laboratory reports has an ash. The citric acid is shown on all three reports and I would say that the variance there is what you might normally expect from a lime juice.

However, this witness admitted that the laboratory reports and analyses in the earlier cases had not been made by him nor under his supervision and that he never saw any of the samples that were examined. He also stated that, as to the total solids shown on the analyses in the incorporated cases, he could only tell, in part, what those total solids consisted of and that the difference in solids, shown by the analyses, represents solids which are not identified or accounted for. He further testified that if a denaturing volatile liquid were present in the commodity analyzed in the incorporated cases it would not show up in the percentage of solids in the report. This witness was asked if, based upon the percentages shown in the analyses of the incorporated cases, he could tell how much lime pulp, as distinguished from possible dirt or sediment, was contained in the sample analyzed, to which he replied that he could give a maximum figure for pulp present, but not as distinguished from dirt. He stated, "There may be no pulp in these two or there may be pulp or there may be pulp and dirt. I have no knowledge of what was actually in them." When asked what he meant by a maximum figure, the witness replied:

A. There couldn't be more than a certain percentage of pulp in either Exhibit 2 or 3 for Identification because the pulp would show in the total solids. We know of the total solids that the 8.43 percent in Exhibit 3 for Identification is not pulp it's citric acid and ash. Therefore the pulp could be a maximum of the difference between 8.43 and 8.6, which is 17/100 of a percent. By the same reasoning, on Exhibit 2 you come up with a maximum of about 44/100 of a percent pulp present, if there is nothing else but pulp in there.

Q. What do you mean by "pulp"?—A. Pulp would be the little cells that surround the little sort of globules of juice that you get in an orange. That's what I would consider pulp.

Q. You mean the natural fruit cells in the fresh lime, is that correct?—A. That's right; that's what I would consider to be pulp.

From the above, it is plain that, from the analyses, the witness considered the reports were comparatively the same as to the total solids, and that one of them showed ash which is comparatively the same as in exhibit 1, the report of the analysis of the sample in the instant case. Also, that he could tell only in part what the total solids shown on the analyses consisted of and that the difference in solids represents solids which are not identified or accounted for. We do not consider this sufficient upon which to base a finding that the merchandise in the incorporated cases and that before the court are

similar. Especially is this true where, as here, the determining factor is whether the lime juice is "unfit for beverage purposes."

A comparison of the representative samples in the various cases, as made by the witnesses, shows substantially the following:

Plaintiffs introduced as illustrative exhibit 4 a sample which Mrs. Garr stated is representative of settled lime juice 1½ years after importation. The Government introduced exhibit A, which the Government examiner, Mr. Seikel, testified is representative of importations of settled lime juice imported at the port of New York.

Plaintiffs' witness Mrs. Garr compared samples of the instant merchandise, as she remembered their appearance, with illustrative exhibit 4. She stated that the latter is clearer and lighter in color; that it would not vary from the samples of the commodity before the court as she remembered them. On cross-examination, she stated that defendant's exhibit A is representative as to the color only of such settled lime juice and that "It's clear in a manner which I think you can only get by putting it through filter paper. The pectin seems to be gone and there isn't any sediment to speak of. I would say that it was a clarified lime juice or perhaps a semi-clarified lime juice, certainly a filtered." This witness was not asked to compare the two above-designated exhibits with the samples in the incorporated cases.

Defendant's witness Schwartz testified that illustrative exhibit 4 is not in appearance a sample of fresh lime juice; that it is perhaps a year or 2 or 3 years old, has unusually heavy sediment, and might have been from the bottom of the barrel. He further stated that exhibit A in appearance is more or less representative of settled lime juice from Dominica at the time of this importation. The color indicates it is less than 6 months old. It is a pale, yellowish green and is not filtered. This witness was shown the exhibits in the imcorporated cases for purposes of comparison. He testified that exhibit A in the *Walker Services* case, Abstract 52607, has unusually heavy sediment; that he would judge it to be 3 or 5 years old; and that it looks as though it must have come from the bottom of the barrel. On cross-examination, he testified that exhibit A in the present case, judging from its appearance, is fresher and contains less sediment than illustrative exhibit 4, which is older and darker and contains heavy sediment; that said exhibit A has practically no sediment or pulp; and that illustrative exhibit 4 has no pulp but does contain a heavy sediment.

The customs examiner, Mr. Seikel, in comparing the various exhibits, gave the following testimony: Illustrative exhibit 4 is not representative in appearance of settled lime juice. He had no recollection of having seen anything like illustrative exhibit 4 as a sample of settled lime juice imported at New York. The quantity of sediment

is not representative of the sediment contained in the commodity at bar; it is too high. Exhibit A herein has the amount of sediment that would be representative of the merchandise at bar. As to illustrative exhibit A in the *Walker Services* case, Abstract 52607, it is not representative of settled lime juice which he has examined and would not be representative of the amount of sediment contained. Illustrative Exhibit B in the same case is not representative of lime juice he has examined. As to illustrative exhibit A in the *Von Laer* case, Abstract 47184, he stated it is not representative of settled lime juice he has examined. Exhibit 1 in that case contains definitely more sediment than the samples he has examined. Illustrative exhibit B in the *Walker Services* case, Abstract 52607, is not representative of the lime juice before the court, nor is exhibit 1 or illustrative exhibit A in the *Von Laer* case, *supra*.

From the record, it is plain that the instant commodity differs materially from that in the incorporated cases. Therefore, the rulings there enunciated can not be *stare decisis* of the issue here involved.

As to the use of the commodity before the court, the importer testified that she has not sold any to manufacturers of soft drinks; that she sells it mostly to Worcestershire-sauce manufacturers; that another purchaser buys it to make chutney, and some is sold to marmalade manufacturers. Prior to 1948, she sold it to flavoring-extract manufacturers. Three barrels out of this shipment were sold to a manufacturer of chutney, one barrel to a manufacturer of marmalade, and the remainder was sold for Worcestershire sauce. She sells it in its condition as imported. If diluted with water, it is not harmful. The purchasers do not give any specifications in ordering, except as to the citric-acid content. She has never sold to manufacturers of citric acid.

From the testimony of Mr. Schwartz, who has imported settled lime juice from Bridgewater Co., the exporter of the instant merchandise, it appears that, from 1948 on, he had sold settled lime juice to manufacturers of beverage extracts; also, to ship suppliers for use by seamen as an antiscorbutic to prevent scurvy. So far as this witness knows, sailors drink it diluted, generally with water. He has sold it to one or two ginger-ale manufacturers who use it in the manufacture of ginger ale. He has sold settled lime juice from Dominica to the above class of customers in the condition as imported for about 23 years. He has never sold it to manufacturers of citric acid. He imports it unfiltered.

Considerable testimony related to what is known as Rose's lime juice. That commodity is not before the court nor is there any evidence that it is the same or similar to the merchandise before us.

Government counsel in the brief filed discusses at length the legislative history of paragraph 806, *supra*, and contends that it indi-

cates that the not specially provided for provision therein was intended to embrace all natural lime juice, for whatever use intended, with the exception only of that affirmatively shown to be "unfit for beverage purposes." That the instant merchandise consisted of natural lime juice is shown by the record.

Mrs. Garr described the method by which the instant lime juice is produced as follows:

The limes are collected and brought to the place where they are settled. They are washed. Then they are crushed in big stone mills. The juice runs off into very large vats, I'd say of possibly a thousand gallons, I don't really know, but they are very large. Then the juice is allowed to remain there anywhere from three weeks, possibly even more, if they are not in a hurry to draw it off. The one set of pulp rises to the top along with most of the oil. And there is another type of pulp which is heavier than liquid which would fall to the bottom. And the settled juice is actually what the word implies, settled. It is a clear juice that is drawn off from the center.

Mr. Schwartz, defendant's witness, described the process in the following language:

Two or three methods of production are used. Originally, they utilized old sugar mills and they crushed the limes between the rollers of these old sugar mills. The rollers were made of, generally speaking—made of marble, heavy stone, sometimes of metal. And the juice would—the pulp and pits would be separated from the juice and the juice would then be run into huge settling vats. And then the juice is permitted to settle in these vats for two to three weeks or sometimes four weeks. And the clear or settled juice is then drawn off with an ordinary spigot or in some of the larger plants, such as Rose's in Dominica, they have quite a complicated looking equipment plant there. But it is by gravitation. And then the residue, the top pulp and the sediment that settles at the bottom is run into the stills for distillation of the oil.

Mrs. Garr testified that there are three types of lime juice; clarified juice, settled juice, and pulpy juice. Only two classes are imported from Dominica, British West Indies—the settled and the pulpy juices. She described the pulpy juice as the unsettled lime juice. The settled juice contains a large quantity of pectin which gives it a cloudy appearance, and it also contains a certain amount of sediment or pulp. The clarified juice is the settled lime juice which has been filtered.

From her testimony, it is apparent that settled lime juice, if diluted with water, is not harmful; that she sells it for flavoring; and that a portion was sold to a manufacturer of chutney, another portion to a manufacturer of marmalade, and the remainder for Worcestershire sauce. It, therefore, is used for human consumption. In the case of *United States* v. *H. F. Ritchie & Co.*, 28 C. C. P. A. 51, C. A. D. 124, which involved a crude lime juice, the court said:

* * * Here the phrase is "unfit for beverage purposes." The statute does not define the commodity affirmatively by its use, but negatively by its quality.

In *Crosse & Blackwell* v. *United States*, 70 Treas. Dec. 380, T. D. 48556, the court construed the provision in paragraph 48, *supra*, to refer to "commodities that because of defects, such as impurities, etc., are unsuitable for use *in* beverages rather than *as* beverages." [Italics quoted.] See also *Crosse & Blackwell Co., Inc.* v. *United States*, 13 Cust. Ct. 177, C. D. 890. We find nothing in the record before us to indicate that this lime juice is unsuitable for use in beverages. In fact, if it is used for flavoring in the commodities mentioned, there would seem to be no reason why it would be unfit for use in beverages. No proof has been presented that it is unfit for such use. In fact, the importer testified as follows:

X Q. I say, if you take it just in its condition as imported, dilute it sufficiently with water, would there be anything harmful in drinking it?

\*      \*      \*      \*      \*      \*      \*

JUDGE EKWALL: Would it be harmful to you personally, physically, if you used it?

THE WITNESS: Not physically. Might be beneficial. It's got vitamin C in it.

As above stated, the Government witness Schwartz testified that he had imported such settled lime juice from Dominica for many years; that he had sold it in this country in the condition as imported; that he does not filter it; that, from 1948 on, he has sold it to manufacturers of beverage extracts and also to ship suppliers who supply British ships with lime juice for beverage purposes, which is used diluted generally with water.

In view of the plaintiffs' admission that the commodity before us was sold in its condition as imported, for human consumption, and the failure of evidence in support of plaintiffs' claim that it was "unfit" for beverage purposes, it seems clear that this lime juice is dutiable under paragraph 806 (a), *supra*, as assessed. The president of the plaintiff corporations testified that it would not be harmful, physically, and might be beneficial in that it contained vitamin C.

Upon the record, we find that plaintiffs' claim is not supported by the evidence. It is, therefore, overruled and the commodity held dutiable, as assessed, at 20 cents per gallon under paragraph 806 (a), *supra*.

In view of this holding, it is unnecessary to lengthen this decision by a discussion of the point raised in the Government brief as to the construction of said paragraph 806.

Judgment will be rendered for the defendant.