(C. D. 1900)

P. John Hanrahan, Inc., Trans. Wm. Bernstein Co., Inc. } *v.* United States

United States Customs Court, Third Division

(Decided July 16, 1957)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* and *Eugene F. Blauvelt* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Dorothy C. Bennett* and *Murray Sklaroff*, trial attorneys), for the defendant.

*Eugene R. Pickrell* as *amicus curiae*.

Before JOHNSON and DONLON, Judges

DONLON, Judge: The official papers in the entry which is the subject of this litigation were not offered in evidence and, therefore, are not of record. Plaintiffs' counsel, on trial, made an opening statement as to the issues that are litigated, and defendant's counsel informed the court that the statement substantially reflected the issues. The merchandise was said to have been invoiced as wheat gum gluten. That fact seems to be conceded.

The merchandise was classified by the collector, in liquidation, under paragraph 1558, as articles, manufactured in whole or in part, not specially provided for. It was charged with duty at the statutory rate of 20 per centum ad valorem, as an edible preparation and, for that reason, excluded from benefit of the modified paragraph 1558 rate of 10 per centum, established by the Torquay Protocol to the General Agreement on Tariffs and Trade (T. D. 52739), made effective by Presidential proclamation (T. D. 52827) on October 7, 1951.

Plaintiffs protested the liquidation, originally claiming only that classification should have been under paragraph 1558 with duty at the modified rate of 10 per centum ad valorem. That is to say, plaintiffs' original protest asserted that this merchandise, while properly classified under paragraph 1558, is not such merchandise as is described in any of the T. D. 52827 exclusions to benefit of the reduced paragraph 1558 rate. Several kinds of merchandise are

enumerated in the Torquay protocol as excluded from rate reduction benefit, and plaintiffs' protest is silent as to which exclusion is the issue here. However, testimony that was adduced and the arguments that have been advanced make it clear that the exclusion here in issue is the exclusion last enumerated, namely, *edible preparations for human consumption other than yeast*. Plaintiffs' claim appears to be that this merchandise is not edible nor is it a preparation and, hence, that it is not an edible preparation. Defendant contends, to the contrary, that this merchandise is both edible and a preparation; that it is, in fact, an edible preparation for human consumption other than yeast.

By amendment, plaintiffs made a further protest claim, namely, that the merchandise should be classified under paragraph 1686 as a natural gum or natural gum resin, not specially provided for, on the free list.

There has been considerable delay in bringing these issues to a head. Although the merchandise was entered November 3, 1952, the entry was not liquidated until September 21, 1954. Trial was repeatedly adjourned at plaintiffs' request. When the case came before the court for the fifth time, defendant moved to dismiss the protest for failure to prosecute. That motion was granted. Thereafter, plaintiffs moved to set aside the judgment of dismissal and prayed for an order restoring the case to trial calendar, on grounds stated in an affidavit of counsel annexed to the motion papers. Defendant advised the court that it had no objection to plaintiffs' motion. The motion was granted, and the case proceeded to trial.

On trial, plaintiffs introduced testimony of two witnesses and a sample of the imported merchandise. Defendant introduced the testimony of three witnesses and also two exhibits, said to be illustrative of several food articles in the manufacture of which wheat gum gluten, similar to this merchandise, is used as an ingredient.

Both parties have briefed the issues. With permission of the court, a brief *amicus curiae* has also been filed, in which counsel for certain domestic manufacturers of wheat gluten argues in support of defendant's case.

There is no serious dispute as to facts. Dispute is as to the law. The briefs, unfortunately, predicate some arguments on asserted facts that are not of record. This is, of course, improper practice. Moreover, it is a practice that places on the court the burden of assessing the validity of certain arguments in their relation, not to the facts stated in the briefs as the basis of those arguments, but to the facts that are actually of record. In this case, a considerable extra task has been thus imposed.

We shall first dispose of the amended claim for free entry under paragraph 1686.

Plaintiffs gave notice that, on trial, they would offer testimony only with respect to their claim under paragraph 1558 and that they would not offer testimony with respect to their amended claim under paragraph 1686. In their brief, plaintiffs state that their claim under paragraph 1686 "is not pressed." Failure both to offer proofs in support of a pleaded cause and to argue it, is tantamount to abandonment or, at the very least, constitutes failure to prosecute the cause. There is before us no motion to dismiss plaintiffs' paragraph 1686 claim. It is overruled.

We next take up the question whether this merchandise comes within the Torquay exclusion to benefit of the reduced paragraph 1558 rate.

As earlier indicated, the record consists of oral testimony and exhibits. Certain facts as to this merchandise are not contradicted in the record. The merchandise, in form as imported, is variously known as wheat gum gluten, or as wheat gluten, or as gum gluten, and it is bought and sold as such. It was imported from Australia and entered on November 3, 1952.

Wheat gluten, or gum gluten, or wheat gum gluten, by whichever name it may be called, is either vitalized or devitalized. This merchandise is vitalized. That signifies that, in the process of preparation, it was dried at low heat, by reason of which it is usable in altogether different ways than if it had been devitalized through a drying process at high heat.

Whereas devitalized wheat gluten is used in the manufacture of amino acids, protein hydrolysates, and monosodium glutamate, vitalized wheat gluten is used to make gluten flour from which bread is made. It is also used in soup concentrates.

The process of making wheat gluten was described in testimony. Plaintiffs' expert witness, Dr. Lauro, said that wheat gluten is a combination or mixture of ingredients, mostly the proteins glutenin and gliadin, obtained by separation from wheat flour. The starch and the proteins are separated by a washing process. The spongy protein mass left, after the starch is washed out, is wheat gluten. It is then dried (in this case, at low heat) and powdered, which results in this merchandise, of which plaintiffs' exhibit 1 is a sample.

There was testimony that, in the form imported, wheat gluten is not habitually eaten as food; indeed, that it cannot be so eaten. The testimony is that vitalized wheat gluten is a high protein ingredient of dietetic breads and some other dietetic foods, used through an intermediate ingredient stage of combination with wheat flour, in order to make what is called gluten flour. Gluten flour is used by bakers of gluten, or protein, breads and by the makers of some other dietetic foods.

Various food products were introduced in evidence by defendant,

as illustrative of foods in the manufacture of which wheat gluten is used. Counsel for plaintiffs objected to admission of these exhibits into evidence, but stated that he would not deny that there is wheat gluten in them. Since that was the sole purpose for which the exhibits were offered, they were received.

The question we are called upon to resolve is whether this merchandise is, or is not, in the language of the Torquay modification of paragraph 1558, an *edible preparation for human consumption other than yeast*. No one contends that wheat gluten is yeast, but all of the emphasized language should be considered in determining what merchandise the negotiators of the Torquay protocol intended to exclude from the benefit of the paragraph 1558 rate reduction.

It is necessary for us to decide what their intention was, if the language they used is ambiguous. It seems evident enough that, at least to these parties, it is ambiguous. They read into the language used by the negotiators diametrically opposite meanings, in applying that language to vitalized wheat gluten, the merchandise before us.

At first reading, it appears that the relevant language is descriptive of a class of articles and also related to their use. Moreover, one article, yeast, is mentioned by the negotiators as an exception to exclusion of the entire class. It must be assumed that the negotiators held the view that, in order to carry out their intention to give yeast the benefit of rate reduction, it was necessary to except yeast, by specific enumeration, from an excluded general category into which it otherwise would fall, namely, edible preparations for human consumption. This may throw some light on their intention as to the class in which, but for specific exception, yeast would be included.

Yeast, the noun, is given five definitions in Webster's New International Dictionary, 1956 edition. Two are of significance here.

1. A substance consisting of the aggregated cells of certain minute sac fungi * * *. Yeast is widely used in making alcoholic liquors, esp. beer, and in baking, as a means of leavening.

3. A commercial product consisting of meal or the like impregnated with living yeast (see sense 1, above) esp., a yeast cake, or yeast cakes collectively.

The latest summary of tariff information, prior to the Torquay protocol, is the 16-volume series, issued by the Tariff Commission in 1948. Volume 15 of that series includes material, under paragraph 1558, on the subject of yeast. In addition to statistics, there is comment (part 9, p. 140), which includes the following:

This summary covers yeast, including nonalcoholic brewers' yeast, and nonalcoholic preparations for flavoring and seasoning food consisting in chief value of yeast extract. Not covered by this summary is dried brewers' yeast of medicinal grade which is classified under paragraph 1669 as a crude drug, and brewers' yeast, alcoholic. Both yeast and the preparations here under consideration fall under the basket clause provision of paragraph 1558 for manufactured articles, n. s. p. f. * * *

The principal uses of yeast are in the brewing industry, in distilling, and in baking. Most of the yeast which enters trade is for baking since most of the yeast for brewing and distilling is made in the plants where it is used. Such trade as there is in brewers' yeast is usually in the form of dried yeast or paste, shipped in barrels under refrigeration. Dried yeast, put up in powder or tablet form is also widely used in confections, flavorings, and as an addition to mixed feeds.

    \*        \*        \*        \*        \*        \*        \*

Imports of yeast and preparations thereof are chiefly in the dried and compressed forms. Brewers' yeast (nonalcoholic) constituted a very small part of total imports in 1939 and 1946 (see table 3). In 1939, the major part of the value of imports of the products under consideration consisted of yeast preparations for flavoring or seasoning food. In that year there were also substantial imports of "other yeast," mostly from Germany. In 1946, the much reduced imports were mostly yeast preparations. Some liquid yeast has been imported in barrels, and small amounts of pure culture yeast have been imported in bottles, especially from Germany in prewar years, for the use of brewers. Imports from Canada have consisted principally of yeast for use in the brewing of ale.

The Tariff Commission reported (Vol. 15, part 9, p. 141) that imports into the United States of yeast and yeast products, nonalcoholic, in 1939 and 1946 were as follows:

(Quantity in pounds)

| Kind | Quantity | Foreign value | |
|---|---|---|---|
| | | Total | By principal sources |
| **1939** | | | |
| Yeast preparations for flavoring or seasoning food, in chief value of yeast extract, containing no alcohol, and not including sauces. | 333, 462 | $135, 550 | Switzerland, $112,275; United Kingdom, $22,764. |
| Brewers' yeast, nonalcoholic. | 2, 830 | 274 | Denmark, $115. |
| Other yeast_____ | 304, 607 | 57, 057 | Germany, $50,561; Poland and Danzig, $3,022. |
| **1946** | | | |
| Yeast preparations for flavoring or seasoning food, in chief value of yeast extract, containing no alcohol, and not including sauces. | 72, 440 | $15, 069 | United Kingdom, $7,818; Cuba, $7,251. |
| Brewers' yeast, nonalcoholic. | 32 | 18 | Canada, $18. |
| Other yeast_____ | 1, 662 | 651 | New Zealand, $360; Canada, $195. |

While there is no evidence of record as to yeast or its uses, it may be accepted, both from the dictionary definitions and from material assembled by the Tariff Commission, *supra*, that yeast is a preparation used as an ingredient in the making of foods and liquors, and that it is not a preparation *habitually* consumed, either as food or drink, in the form of yeast.

If wheat gluten is not a preparation, in the tariff sense, no consideration of other arguments is necessary. If this merchandise is not a preparation, it does not matter whether or not it is "edible" or "for human consumption." What, then does the record show relative to that issue?

"Preparation" is a noun which signifies the act or process of preparing, and also that which is prepared. There is no ambiguity as to which was the meaning the negotiators of the Torquay protocol had in mind, in the language we are called upon to construe. "Preparations" are those things which are prepared. Webster's New International Dictionary, 1956 edition, defines "preparation," in that sense, as follows:

4. That which is prepared; something made, equipped, or compounded for a particular purpose; as: a Any medicinal substance fitted for use. b Anything treated for preservation or examination.

We are of opinion that the described process by which wheat gluten is separated from wheat starch, dried at low heat so as to preserve viability, and then powdered, in order to make this product for a particular use, namely, as the high protein component of special diet foods, is a process of preparation, and that the resulting wheat gluten is a preparation in the tariff sense.

In *United States* v. *Aetna Explosives Company*, 256 U. S. 402, the Supreme Court had before it the question whether nitric acid, to which sulphuric acid had been added in order to prevent corrosion of transporting tank cars, was dutiable under a provision for chemical and medicinal compounds, *preparations*, mixtures, and salts. The Court, at page 404, quoted with approval from the opinion below, as follows:

The word "preparations" [in paragraph 5] implies of course that they are something prepared and adapted to particular uses or services. It is no stretch to say that the word "mixtures" as here employed was used in a similar sense to import mixtures susceptible of commercial use as they exist, or are at least such as are purposely started on their way toward adaptation to such use. * * * The sole purpose for which this addition was made was to admit of shipment. It would be sticking in the bark to say that this was such a mixture as the statute in question contemplates. It is not yet prepared. It has not been advanced as a preparation for actual use * * *. [Matter in brackets quoted.]

The record before us shows that vitalized wheat gluten has been prepared and adapted to a particular use. At the very least, it has

been purposely started on its way toward adaptation to a particular use. It is a preparation.

There remains for decision the construction proper for the remaining language of the Torquay exclusion, in relation to this merchandise. Granted that wheat gluten is a preparation, is it an *edible* preparation *for human consumption?*

We find only one case in which the language of the Torquay protocol now before us has been judicially construed. In *Schall & Co.* v. *United States*, 34 Cust. Ct. 110, C. D. 1688, we held that angelica glace is an edible preparation for human consumption, other than yeast, within the meaning of the Torquay modification of paragraph 1558. Angelica glace is processed from leafstalks of the angelica plant. The leafstalks are candied. They are used to decorate cakes, and the decoration is eaten, habitually, as a part of the cake.

Several decisions have been cited in the briefs, in which courts have construed the word "edible" under various tariff provisions and in relation to varying fact situations.

In *United States* v. *Yick Shew Tong Co.*, 25 C. C. P. A. (Customs) 255, our appeals court considered the provision of paragraph 1669 of the Tariff Act of 1930, with respect to enumerated drugs "and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for * * *."

Applying paragraph 1669 to the merchandise before it, our appeals court construed the word "edible" as follows:

* * * It is true that one of the requirements of that paragraph [i. e., 1669] is that the articles shall not be edible, and it is proven here that the products have been eaten without any deleterious effects. * * * The word edible, we think, must be given its common meaning and construed in the sense of its ordinary use and acceptance.

Quoting definitions both from Webster's New International Dictionary and the Century Dictionary and Encyclopedia, the appeals court leaned on the meaning of edible as "fit to be eaten *as food*" and "objects which are *habitually* eaten by man, or *specifically* fit to be eaten * * * ." [Italics are the appeals court's.]

In *Cruikshank* v. *United States*, 59 Fed. 446 (1894), the Circuit Court of Appeals, Second Circuit, considered the edibility of certain imported spice "chillies" or bird "peppers," whole, in a dried state, under the provision of paragraph 560 of the Tariff Act of 1890 for spices, not edible. Holding that "chillies" are not edible, Judge Wallace stated, at page 449:

* * * It is not material that they can be converted into the dutiable article by mixing them with other ingredients, and subjecting them to the various processes bestowed upon that article, or even by advancing them a single step in the

process of preparation. The law deals with them as they are, and not as they can be made to be.

In a still earlier case (1893), the Circuit Court for the Southern District of New York defined "edible." *In re Cruikshank*, 54 Fed. 676. Spices "not edible" were entitled to free entry. An edible spice was not free. The court, in an opinion by Judge Coxe, discussed the meaning of edible, as follows:

> * * * The adjective "edible" found in this connection must be considered as a relative term qualified somewhat by the noun which follows it. As applied to spices it means a spice which is eaten as spices are eaten; namely, as a sauce, a condiment, a relish, not as a food product, capable of sustaining life. We speak of edible fruits and edible meats; we also speak of edible oils and edible salts; but no one supposes that the adjective is used in the same sense regarding all of these, or that when so used it is intended to convey the idea that the salt and oil are eaten in the same manner as the fruit and meat. It is fair to assume that this distinction was in the legislative mind when the tariff law was enacted. * * *

We are of opinion that the exclusionary provision of the Torquay modification of paragraph 1558, *edible preparations for human consumption other than yeast*, shows an intention that is not the same as was signified by the sole word "edible" in the statute, as construed in earlier cases. All of the words used by the negotiators should be given their intended weight. None should be passed over or ignored. If, by edible preparations, it was intended to comprehend only those preparations that are *habitually* eaten as food, the words "for human consumption" would be redundant. If only those preparations, *habitually* eaten as food in the preparation form, had been deemed by the negotiators as comprehended within the class of *edible preparations for human consumption*, it would have been unnecessary to specify yeast as an exception to the class.

There is a construction that gives significance to all of the words the negotiators used to express their intention, and that construction is determinative of our decision in this case. Yeast, a preparation used as a foodstuff ingredient, but not *habitually* eaten in the yeast form, nonetheless, may be and is sometimes eaten in the yeast form. While the record is barren of such proof, it is a matter of common knowledge that yeast can be and is eaten as a special diet item. *In that sense, it is edible.* It can be eaten. It is eaten, although not habitually, as yeast.

As to vitalized wheat gluten, the record before us is clear. It cannot be eaten, unless and until it is converted into another form. It cannot be eaten as wheat gluten. It is neither edible in the sense of being a preparation, *habitually eaten* as food, nor in the sense of being, like yeast, a foodstuff preparation that may be and sometimes is eaten in the preparation form.

Vitalized wheat gluten is a preparation for human consumption. It is not an edible preparation for human consumption. It is, therefore, not within the class excluded by the Torquay protocol from benefit of the reduced rate of 10 per centum under paragraph 1558.

The protest claim under paragraph 1558 is sustained. The protest claim under paragraph 1686 is overruled.

Judgment will be entered accordingly.