(C. D. 2051)

DALTON COOPER, INC., ET AL. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided December 4, 1958)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Dorothy C. Bennett, Richard H. Welsh*, and *Sheila N. Schwartz Ziff*, trial attorneys), for the defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges; DONLON, J., dissenting

RICHARDSON, Judge: This case consists of 25 consolidated protests against the classification of settled lime juice and filtered lime juice, which has been treated with sulphur dioxide, under the provisions of paragraph 806 (a) of 19 U. S. C. section 1001 (paragraph 806 (a) of the Tariff Act of 1930), as modified by T. D. 49753, as fruit juices, not specially provided for, containing less than one-half of 1 per centum of alcohol; and the assessment of the merchandise at 35 cents per gallon or, where entry was made after January 1, 1948, under that paragraph, as modified by T. D. 51802, at 20 cents per gallon.

The plaintiffs contend that the merchandise is dutiable as lime juice "unfit for beverage purposes" under paragraph 48 of 19 U. S. C. section 1001 (paragraph 48 of the Tariff Act of 1930), as modified by T. D. 50797, at 2½ cents per pound or, where entry was made after January 1, 1948, under that paragraph, as modified by T. D. 51802, at 1¼ cents per pound.

Nine of the protests are in the name of Dalton Cooper, Inc., 1 in the name of Lenox, Inc., 3 in the name of McLeer & McLeer, Inc., and 12 in the name of Diamond Ginger Ale, Inc.

The record in *Dalton Cooper, Inc.*, and *Meadows Wye & Co., Inc.* v. *United States*, 32 Cust. Ct. 262, C. D. 1611, was incorporated in the 25 consolidated protests before the court. In the incorporated case, the plaintiffs' claim that their settled lime juice was unfit for beverage purposes was not supported by the evidence of record, as no sample of the merchandise involved was introduced into evidence nor were witnesses interrogated as to whether the involved merchandise was comparable to the samples in the three cases there incorporated of *Walker Services* v. *United States*, 28 Cust. Ct. 109, C. D. 1395, *Walker Services* v. *United States*, 21 Cust. Ct. 218, Abstract 52607, and *Von Laer* v. *United States*, 8 Cust. Ct. 517, Abstract 47184, in which the court had held settled lime juice to be "unfit for beverage purposes." The evidence in those three cases disclosed that the lime juice was filtered after importation in order to make it more attractive for sales purposes, and the court found that in the condition as imported the settled lime juice was unfit for beverage purposes.

The plaintiffs, in this case, have sought to supply the evidence which the court indicated was necessary in the incorporated *Dalton Cooper* case to prove that a lime juice is "unfit for beverage purposes." It has been stipulated that the merchandise described as settled lime

juice on the invoices of the Dalton Cooper, Inc., protests before the court *is identical* with the settled lime juice involved in the incorporated *Dalton Cooper, Inc.*, case. It was also stipulated that the merchandise described as settled lime juice on the invoice in the name of Lenox, Inc., *is similar* in all material respects with the settled lime juice involved in the incorporated case. Illustrative exhibit 1 was received in evidence as a sample representative of the merchandise involved in the incorporated case and as representative of the merchandise in the 9 Dalton Cooper, Inc., protests presently before the court.

Mrs. Garr, president of Dalton Cooper, Inc., testified in the incorporated case that settled lime juice is produced as follows:

> The limes are collected and brought to the place where they are settled. They are washed. Then they are crushed in big stone mills. The juice runs off into very large vats, I'd say of possibly a thousand gallons, I don't really know, but they are very large. Then the juice is allowed to remain there anywhere from three weeks, possibly even more, if they are not in a hurry to draw it off. The one set of pulp rises to the top along with most of the oil. And there is another type of pulp which is heavier than liquid which would fall to the bottom. And the settled juice is actually what the word implies, settled. It is a clear juice that is drawn off from the center.

She further testified, in the case presently before the court for decision, that settled lime juice in exhibit 1 was imported from Dominica, British West Indies; that it gets darker with age and will ferment; that, if used in a beverage in an unfiltered condition, the pulp will rise to the top and form a scum and, in some cases, sediment resembling dirt will settle on the bottom; that, in the two instances in which her company, by mistake, sold unfiltered settled lime juice for use in beverages, large quantities of the merchandise of the companies (Lime Cola and Seven-Up) were ruined. (R. 9–21.) Dr. David Jorysch, chief chemist of H. Kohnstamm & Co., testified that settled lime juice is unfit for beverage purposes because it contains an excessive quantity of molds and micro organisms. His company purchased several barrels of so-called settled lime juice from Dalton Cooper, Inc., which it resettled, siphoned off the clear juice, and filtered the remainder, which it used in an extract that eventually went into a beverage (R. 266). Henry A. Anusiak, assistant chemist of the American Beverage Co. in Brooklyn, N. Y., testified that his company bought settled lime juice from Dalton Cooper, Inc., and had to filter and pasteurize before using in its beverages; that the pasteurizing (heating) was necessary to kill bacteria; and that when his company tried using settled lime juice in a lime rickey, without filtering and pasteurizing, its customers returned the merchandise because it had fermented. (R. 329.)

The 3 protests in the name of McLeer & McLeer, Inc., involve 84 casks of Rose's lime juice imported from L. Rose & Co., Ltd., in Lon-

don, England, by McLeer & McLeer of New York City and sold to Distillers Co., Ltd., in Linden, N. J. Distillers Co., Ltd., used 24 of the casks of the lime juice as ingredients in making what was called Gordon's Gimlet Cocktails, and sold the remaining 60 casks to the Diamond Ginger Ale Co. of Waterbury, Conn. Before using the 24 casks of lime juice in the Gordon's Gimlet Cocktails, the lime juice was filtered, using a filtering agent in conjunction with the filter, thus making it clearer, and it was roused with compressed air causing the sulphur dioxide preservative to evaporate (R. 53), according to Alexander S. Haig, an assistant secretary and chemist at Distillers Co., Ltd. Mr. Haig stated that the lime juice was not fit for beverage purposes in its imported condition, because he did not consider a cloudy beverage as fit, but that if someone did not mind having a cloudy beverage it might be possible to use it as a beverage *after aeration*, which is a process of removing the sulphur dioxide. He also testified that plaintiffs' illustrative exhibit 1 is representative of the lime juice which his company received from McLeer & McLeer, except that the latter lime juice was a little yellower in appearance (R. 31–32). Balanced against Mr. Haig's testimony is the testimony of William A. Patrick, in charge of Diamond Ginger Ale Co.'s plant manufacturing sirups and extracts, that, to the best of his knowledge, casks of "Rose's was always filtered" (R. 81); the statement by John Boyter-Smee, director of L. Rose & Co., Ltd., London, England, in response to interrogatory No. 14 in commission No. 1358 with respect to these three shipments to McLeer & McLeer that the lime juice was filtered; and the fact that the invoices in these three shipments indicate that the merchandise is the same as that shipped directly to Diamond Ginger Ale Co. by Rose & Co., Ltd. The court is of the opinion that the lime juice in the McLeer & McLeer protests was filtered lime juice which had been treated with sulphur dioxide as a preservative.

The 12 protests in the name of Diamond Ginger Ale Co., involve 25 hogsheads of "Starbright" lime juice imported from A. C. Shillingford & Co. of Dominica, British West Indies; 5 casks of "Starlite" lime juice imported from Cooperative Lime Juice Products Co., Port of Spain, Trinidad, British West Indies; and 144 casks of Rose's lime juice which the Diamond Ginger Ale Co. imported directly from L. Rose & Co., Ltd., London, England. William A. Patrick testified that the merchandise imported from the British West Indies was settled lime juice which could not be used in the manufacture of ginger ale, because it would make the drink "turbid, cloudy, [and] very unappetizing looking." He stated that his company tried using it without filtering, and it was rejected by their customers. He also testified that plaintiffs' illustrative exhibit 1 is similar to the settled lime juice which his company purchased in the British West Indies (R. 72, 74) and that before using the lime juice from the British West

Indies in the manufacture of ginger ale his company sent it to Von Leer & Co. in Boston where it was filtered. He testified that the casks of Rose's lime juice which the company imported directly from L. Rose & Co., Ltd., was always filtered and did not have to be re-filtered. (R. 81 and 89.) In response to direct interrogatory No. 4 in commission No. 1357, relating to the 144 casks, John Boyter-Smee stated that "There is only one standard [lime juice shipped in bulk to the United States by my company] and that is natural strength lime juice." In response to direct interrogatory No. 9, he stated that the juice was obtained from limes grown in the British West Indies and "all shipments [from London, England] consist of filtered lime juice," to which sulphur dioxide is added as a preservative. In response to direct interrogatory No. 20 as to whether the lime juice was fit for use in beverages in its condition at the time of exportation from England, he said "Definitely yes." The laboratory reports on the analyses of the 144 casks of Rose's lime juice imported from England by Diamond Ginger Ale Co., which were made under the supervision of the assistant chief chemist in the United States Customs Laboratory at New York, Mr. Herbert W. Eckweiler (defendant's collective exhibit G), stated that since the lime juice was not shown to be deleterious to human consumption, it was fit for beverage purposes. (R. 177.)

Testimony with respect to Minute Maid limeade (a quick frozen concentrated juice made from fresh domestic limes grown in Florida), to which sugar is added, and in which the law prohibits the use of sulphur dioxide (R. 106); Rose's bottled lime juice; and Chill Ripe Fruit limeade (a quick frozen concentrated juice made from fresh limes grown in Mexico, to which sugar is added) showed these lime products to be so distinctly different from the involved merchandise as to offer no assistance in determining whether settled lime juice and filtered lime juice treated with sulphur dioxide are unfit for beverage purposes. One of the witnesses, Mr. Franklin Eades Penn, vice president of the Minute Maid Corp., stated that his company could not use settled lime juice in its product because, one, settled lime juice is old and its product required fresh limes, sugar, and quick freezing; and, two, settled lime juice is treated with sulphur dioxide, which his company would not be permitted by law to use. (R. 106.) No one testified in this case who is a user of settled lime juice in their products without filtering. One witness in the incorporated case, Mr. Arthur Schwartz, did testify that he imported and sold settled lime juice in an unfiltered condition to manufacturers of beverage extracts, which are used to make a carbonated bottled beverage, but there was no positive showing whether the purchaser used the settled lime juice in its product without first processing it. (R. 113.)

There are two types of lime juice in this case—(1) settled lime juice which is involved in the protests of Dalton Cooper, Inc.; Lenox, Inc.; and the shipments to Diamond Ginger Ale Co. from Trinidad and Dominica, British West Indies; and (2) filtered lime juice treated with sulphur dioxide which is involved in the protests of McLeer & McLeer and the protests of Diamond Ginger Ale Co. involving shipments from L. Rose & Co., Ltd., directly to Diamond Ginger Ale Co. After a careful analysis of all the testimony in the case and an examination of the exhibits in evidence, we think the importers have established that the involved merchandise is unfit for use as a beverage or in a beverage, within the meaning of paragraph 48, and is not fruit juices, not specially provided for, under paragraph 806 (a), since in its imported condition each type of lime juice requires some processing before it is commercially fit for use as a beverage or in a beverage. Merchandise is classifiable for duty purposes in its condition as imported. *United States* v. *H. F. Ritchie & Co.*, 28 C. C. P. A. (Customs) 51, C. A. D. 124.

The words "fit" and "unfit" are defined in Webster's New International Dictionary, 2d edition (1958) as follows:

**fit**, *adj.*; . . . suitable.
**unfit**, *adj.* 1. Not fit; unsuitable.

The term "suitable" in tariff law means actually, practically, and commercially fit. *Kahlen* v. *United States* (1911), 2 Ct. Cust. Appls. 206, T. D. 31947, and *Coro, Inc.* v. *United States*, 41 C. C. P. A. (Customs) 215, C. A. D. 554. "Un" is a prefix meaning "not," so it would follow that "unsuitable" in tariff law means not actually, practically, and commercially fit. Since the term "unfit" means "unsuitable," it follows that the statutory provision for lime juice "unfit for beverage purposes" applies to lime juice which is not actually, practically, and commercially fit for beverage purposes. The imported merchandise is unfit for beverage purposes if in its condition as imported it is not actually, practically, and commercially fit for use either as a beverage or in a beverage. Plaintiffs have established that all of the imported lime juice required some processing to make it suitable for use as a beverage or in a beverage. Where it is shown that lime juice as imported cannot be used for beverage purposes until it has been processed to make it suitable for such use, it is classifiable under paragraph 48. *United States* v. *H. F. Ritchie & Co.*, *supra*; *Walker Services* v. *United States*, 21 Cust. Ct. 218, Abstract 52607; and *Von Laer* v. *United States*, *supra*.

Upon the record, we find that plaintiffs' claim is supported by the evidence and all of the protests against the classification of settled lime juice, and filtered lime juice which has been treated with sulphur dioxide under the provisions of paragraph 806 (a) of 19 U. S. C. section 1001 (paragraph 806 (a) of the Tariff Act of 1930), as modified

by T. D. 49753, as fruit juices, not specially provided for, containing less than one-half of 1 per centum of alcohol; and the assessment of the merchandise at 35 cents per gallon or, where entry was made after January 1, 1948, under that paragraph, as modified by T. D. 51802, at 20 cents per gallon are sustained and the merchandise held dutiable under paragraph 48 of 19 U. S. C. section 1001 (paragraph 48 of the Tariff Act of 1930), as modified by T. D. 50797, at 2½ cents per pound or, where entry was made after January 1, 1948, under that paragraph, as modified by T. D. 51802, at 1¼ cents per pound, and the collector of customs is directed to reliquidate the entries accordingly.

Judgment will be rendered accordingly.

### DISSENTING OPINION

DONLON, Judge: I would have no difficulty in concurring with the opinion of the majority, were it not for the recent decision of our appeals court in *United States* v. *P. John Hanrahan, Inc., Trans., et al.,* 45 C. C. P. A. (Customs) 120, C. A. D. 684, handed down June 18, 1958.

In the *Hanrahan* case, the record established that the imported merchandise, wheat gluten, is never eaten as food, is insoluble in the juices of the mouth, is unpalatable, and, if chewed, becomes a spongy mass difficult to swallow, and that it is indigestible. Nevertheless, a majority of the appeals court held that such wheat gluten was an edible preparation for human consumption. The issue was stated in the majority opinion as follows:

The determination as to whether the instant merchandise is edible, within the meaning of the applicable provision of the Torquay Protocol, depends upon whether that word, as there used, embraces all preparations which may ultimately be consumed in foods, or is limited to those which may be eaten in the form in which they are imported.

The decision of the court was stated as follows:

We find no reason for applying to the word "edible," as here under consideration, any meaning other than its common one which, in our opinion, embraces a preparation such as the instant merchandise, which is commonly used as an ingredient of foods and is prepared for that purpose. It is not necessary that the preparation should normally be eaten in the condition in which it is imported. It is, of course, true, as urged by appellee, that classification must be determined on the basis of the condition of the merchandise at the time of importation, but the instant merchandise, as imported, is capable of being eaten, and therefore is edible even though it must be mixed with other ingredients and cooked before the actual eating takes place.

There are, of course, certain distinctions at law between the tariff term which is construed in the *Hanrahan* case, "edible preparations for human consumption," and the tariff term now before us, "fit [or unfit] for beverage purposes." However, the record before us shows

that the instant merchandise, as imported, can be consumed as a beverage, although distasteful; that it is used as an ingredient of beverages; and that it is capable of use for beverage purposes even though it is first mixed with other materials and treated, as by aeration (mixing with air) or pasteurization (cooking), before actual beverage use occurs.

The issue here seems to be basically the same as the issue that was stated by the court in the *Hanrahan* case. If so, the tariff term appears to embrace all preparations which may ultimately be consumed for beverage purposes, and is not limited to those consumed for beverage purposes in the form in which imported.

On the facts of record here, and the rule that was laid down by our appeals court in the *Hanrahan* case, *supra*, I am constrained to dissent.