(C.D. 2398)

HEUBLEIN, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 15, 1963)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiff.
*John W. Douglas,* Assistant Attorney General (*Harold L. Grossman,* trial attorney), for the defendant.

Before OLIVER and WILSON, Judges

WILSON, Judge: The merchandise in the case at bar consists of certain apricot, raspberry, and strawberry natural fruit flavoring extracts, containing approximately 15 to 17 per centum of alcohol by volume or 11.9 per centum to 13.5 per centum by weight. It was classified under paragraph 24 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of 7½ cents per pound and 9 per centum ad valorem as fruit flavoring extracts, containing not over 20 per centum of alcohol. In addition, the merchandise was assessed with internal revenue tax at the rate of $10.50 per wine gallon under the provisions of section 5001 of the Internal Revenue Code of 1954.

Plaintiff, while agreeing that the merchandise in question is properly dutiable under said paragraph 24, *supra,* contends that these extracts are not subject to the assessment of the internal revenue tax here made. It appears that paragraph 24 of the tariff act, as modified, *supra,* contains a proviso pursuant to which customs duties are reduced upon flavoring extracts which are subject to internal revenue tax. Plaintiff contends, in this connection, that, if the internal revenue tax was improperly assessed, as alleged, a higher rate of duty of 15 cents per pound and 9 per centum ad valorem, as provided for in paragraph 24, *supra,* is applicable to the merchandise.

There were received in evidence certain reports setting forth the percentage of alcohol contained in each of the three flavoring extracts here in question (defendant's exhibits A, B, and C). Plaintiff's collective exhibits 1–A, 1–B, and 1–C consist of samples of strawberry, raspberry, and apricot extracts, respectively, which were taken from the importation at bar.

The testimony in the case consisted of one witness for the plaintiff and one for the Government. Mr. Lawrence Carl Vergobbi, chief chemist in charge of research and development of the liquor products for the plaintiff concern, testified that, as superintendent of the winery for his company, he is familiar with the complete production processes employed in the manufacture of wine, as well as extracts used to flavor wine for the manufacture of vermouth. He had also done research and development work on other beverages in regard to the use of botanicals and flavoring materials (R. 14–15).

Describing the use of the involved merchandise, Mr. Vergobbi stated:

A.  This juice here is used, first of all, by incorporating it with other flavors or with other natural flavors, other fruit flavors of this kind, plus alcohol, plus sugar, and plus water, in which case they are all incorporated together, they are mixed and they are treated, and for stabilization and so that they will be clear and be commercially acceptable when they are bought. These particular products here require treatment beforehand, as we have proved in our laboratory in the various tests that we have run on them, that these products here require treatment in order to stabilize them and before they are used in our products, in order that there is no deleterious effect on our finished product. (R. 21–22.)

The witness explained that the stabilization treatment employed on these extracts consists of heating the material to give what is called a pasteurization process; that the proteinaceous material is then further treated to stabilize the mass against cold, in which case the material is cooled down to just above the freezing point, so as to precipitate that insoluble material which one wishes to remove, because such material, if left in the processed extract, would cause a sedimentation, when combined with the other ingredients to make the finished product, which would detract from the appearance of the latter (R. 23). He further testified that, without receiving the treatment so described, it would be most difficult, if not impossible, to produce a beverage that would be commercially acceptable; that the materials here imported are not fit for human consumption or use as a beverage in their imported condition, because there are no such commercial products on the market, inasmuch as their appearance is very cloudy and very hazy, and because they do not look well and would not be acceptable; further, that products of this kind are deficient in sugar and deficient in acidity necessary to give them the proper taste—and that they are "primarily manufactures to be used as an intermediate" (R. 24–25). Plaintiff's witness expressed the opinion that the involved extracts are not potable.

Mr. Vergobbi stated that he did not consider the extracts in question alcoholic distillates—because "a product of distillation is one that is made by taking various ingredients and mixing them with alcohol,

and then distilling the entire mass and condensing it and collecting the distillate," and that "these are not made that way" (R. 29).

On cross-examination, Mr. Vergobbi testified that the imported merchandise could not be used to flavor a beverage in the condition as imported. He agreed, however, that this merchandise contains "distilled spirits" (R. 29), explaining that it was "a compound containing distilled spirits" (R. 32).

Defendant's witness was Mr. Philip V. Porto, employed by the United States Treasury Department, Alcohol, Tobacco Tax Division, as a chemist. This witness testified that he had personally analyzed the merchandise under consideration and that the alcoholic content of the importations at bar was as follows: Extract of apricot, 16.4 per centum alcohol by volume; extract of raspberry, 17.6 per centum alcohol by volume; and extract of strawberry, 15.8 per centum alcohol by volume.

Apparently, the ultimate issue in this case, as proposed by counsel for the respective parties herein, is to be resolved upon the determination of the question whether the imported merchandise is or is not fit for beverage purposes. Our attention has been directed by counsel to certain holdings by this and our appellate court in a number of cases, either in support of the classification as here made or in substantiation of the plaintiff's claim. These will be hereinafter adverted to with such reference as is deemed pertinent in the premises.

In *Crosse & Blackwell* v. *United States*, 70 Treas. Dec. 380, T.D. 48556, the court therein held certain settled lime juice to be excluded from the provision in paragraph 48 of the Tariff Act of 1930 for "juice of * * * limes, * * * unfit for beverage purposes," as claimed, and properly dutiable as "fruit juices * * * not specially provided for, containing less than one-half of 1 per centum of alcohol," under paragraph 806 of the Tariff Act of 1930, as assessed. In so holding, the court, pages 382–383, stated:

We note that in the act as finally passed Congress used the term "unfit for beverage purposes," rather than "unfit for use as a beverage." We think that fact is significant. It is our opinion that by such phrase it had in mind commodities that because of defect, such as impurities, etc., are unsuitable for use *in* beverages rather than *as* beverages. * * *

The record discloses that the imported lime juice is used in making lime cup by adding equal parts of water, about 30 per centum of sugar, and a small quantity of fruit acid. The resulting product is consumed as a beverage after it has been diluted with three parts of water. We, therefore, find that this lime juice is used in beverages, and therefore is excluded from the purview of paragraph 48, *supra*. [Italics quoted.]

In *United States* v. *P. John Hanrahan, Inc., et al.*, 45 CCPA 120, C.A.D. 684, our appellate court, one judge dissenting, held certain wheat gluten or wheat gum gluten properly dutiable under paragraph 1558 of the Tariff Act of 1930 as a manufactured edible preparation

for human consumption, and thus excluded from the modified provisions of said paragraph, which imposed a lower rate of duty on manufactured articles, not specially provided for, except "edible preparations for human consumption other than yeast." In so doing, the appellate court reversed the decision in *P. John Hanrahan, Inc., Trans., et al.* v. *United States*, 39 Cust. Ct. 37, C.D. 1900. The issue in the *Hanrahan* case, *supra*, was stated in the majority opinion of our appellate court, page 122, as follows:

The determination as to whether the instant merchandise is edible, within the meaning of the applicable provision of the Torquay Protocol, depends upon whether that word, as there used, embraces all preparations which may ultimately be consumed in foods, or is limited to those which may be eaten in the form in which they are imported.

and, at page 124, the court concluded:

We find no reason for applying to the word "edible," as here under consideration, any meaning other than its common one which, in our opinion, embraces a preparation such as the instant merchandise, which is commonly used as an ingredient of foods and is prepared for that purpose. It is not necessary that the preparation should normally be eaten in the condition in which it is imported. It is, of course, true, as urged by appellee, that classification must be determined on the basis of the condition of the merchandise at the time of importation, but the instant merchandise, as imported, is capable of being eaten, and therefore is edible even though it must be mixed with other ingredients and cooked before the actual eating takes place.

The issue in the case at bar, as to the construction of the term "fit for beverage purposes," appears to be basically the same as that in the *Hanrahan* case, *supra*, where, as heretofore noted, the tariff term there being construed was "edible preparations for human consumption." As we construe the reasoning of our appellate court in the above-cited case, we are of opinion that, as applied to the merchandise in the case at bar, the term "fit for beverage purposes" embraces all preparations or ingredients which may ultimately be consumed as a beverage, even though such preparations must be mixed with other ingredients and subjected to processing or treatment before they can be used as a beverage, and we are further of opinion that the term in question is not limited to those products which are or can be consumed for beverage purposes in the form in which imported. The merchandise here involved meets the tests for a product "fit for beverage purposes." In this connection, we may observe that we have considered the holding of the court in the case of *R. U. Delapenha & Co., Inc.* v. *United States*, 39 Cust. Ct. 136, C.D. 1918, and its application to the relevant question here before us.

Counsel for the plaintiff especially directs our attention to the holding of the court in *Dalton Cooper, Inc., et al.* v. *United States*, 41 Cust. Ct. 271, C.D. 2051, which involved certain settled lime juice and filtered lime juice, which had been treated with sulphur dioxide.

The importations were classified under paragraph 806(a) of the Tariff Act of 1930, as modified, as fruit juices, not specially provided for, containing less than one-half of 1 per centum of alcohol and claimed properly dutiable at the applicable rates under paragraph 48 of the act, as modified, as lime juice "unfit for beverage purposes." The record in the above-cited case disclosed that the settled lime juice, in its imported condition, required filtering, and, in some instances, pasteurization, and that the filtered lime juice, containing sulphur dioxide as a preservative, in its imported condition, required aeration to remove the sulphur dioxide before such lime juices could be "actually, practically, and commercially" used as beverages or in a beverage. The weight of the testimony of witnesses called on behalf of the plaintiff in the *Dalton Cooper* case, *supra*, was to the effect that the merchandise there involved, in its condition, as imported, was not fit for beverage purposes. The court therein, one judge dissenting, page 276, held that the involved merchandise was unfit for use as a beverage or in a beverage "since in its imported condition each type of lime juice requires some processing before it is commercially fit for use as a beverage or in a beverage."

In the *Dalton Cooper* case, *supra*, Judge Donlon, in her dissenting opinion therein, stated, at pages 277 and 278, as follows:

There are, of course, certain distinctions at law between the tariff term which is construed in the *Hanrahan* case, "edible preparations for human consumption," and the tariff term now before us, "fit [or unfit] for beverage purposes." However, the record before us shows that the instant merchandise, as imported, can be consumed as a beverage, although distasteful; that it is used as an ingredient of beverages; and that it is capable of use for beverage purposes even though it is first mixed with other materials and treated, as by aeration (mixing with air) or pasteurization (cooking), before actual beverage use occurs.

The issue here seems to be basically the same as the issue that was stated by the court in the *Hanrahan* case. If so, the tariff term appears to embrace all preparations which may ultimately be consumed for beverage purposes, and is not limited to those consumed for beverage purposes in the form in which imported.

In the case at bar, the testimony of plaintiff's witness was to the effect that the flavoring extracts under consideration are not fit for human consumption or for use as a beverage in their imported condition, inasmuch as their "appearance" is very cloudy and very hazy, and because they would not be commercially acceptable without further treatment so as to coagulate the proteinaceous material in them and remove sedimentation which, the witness stated, detracted from the appearance of the extract. Without passing upon the efficacy of the treatment stated to be required upon the extracts in this case, we are persuaded that the situation here parallels such as was outlined in the dissenting opinion in the *Dalton Cooper* case, *supra*.

The burden of establishing that the imported merchandise was not fit for beverage purposes within contemplation of law rests upon the plaintiff in this case. *Wah Shang Company* v. *United States*, 44 CCPA 155, C.A.D. 654. In this connection, we are, of course, cognizant of the rule applied by our appellate court in the case of *United States* v. *H. F. Ritchie & Co.*, 28 CCPA 51, C.A.D. 124, to the effect that merchandise is classifiable in its condition, as imported. In order for the plaintiff to establish that the imported merchandise, fruit flavoring extracts, is unfit for beverage purposes, it must affirmatively show that, in its condition, as imported, it "is not actually, practically, and commercially fit for use either as a beverage or in a beverage." *Dalton Cooper, Inc.*, case, *supra*.

It was conceded, on cross-examination, that the imported merchandise contains distilled spirits and that it has an alcoholic content of approximately 16 per centum. Plaintiff herein relies chiefly upon the testimony of its sole witness, a research chemist engaged in quality control and in the research and development of the various ingredients that are used in the various food and liquor products of his company. However, there is nothing in the record in this case to evidence that the witness had sufficient commercial and trade experience to factually establish or to validly predicate a conclusion that the involved merchandise was not actually, practically, and commercially fit for use as a beverage or in a beverage. The fact that these products require some treatment after importation does not, in our opinion, in and of itself, preclude a finding that the extracts in question are fit for use as a beverage or in a beverage.

In *Polak & Schwarz, Inc.* v. *United States*, 26 Cust. Ct. 126, C.D. 1312, certain raspberry flavor was held, as here, properly classified as a flavoring extract, and, in addition, subject to an internal revenue tax under the appropriate provisions of the code as "distilled spirits" or products of distillation containing distilled spirits. While the testimony in the *Polak & Schwarz* case, *supra*, was to the effect that, as imported, the involved commodity had a strong fruit taste, definitely raspberry, was not palatable, and, therefore, not fit for use as a beverage, and that, in order to use it in the best manner, it would have to be diluted or compounded with other extracts, nevertheless, the court therein held the merchandise properly subject to the assessment of the internal revenue tax. In so holding, the court, page 131, stated:

* * * Plaintiff does not deny that the extract contains absolute ethyl alcohol to the extent of 14.2 per centum by weight and 17.5 per centum by volume. The legislative history of the internal revenue act and the decisions thereunder show the purpose of the law to impose a tax on all products of distillation which contain distilled spirits or alcohol. The fact that the instant commodity is not used as a beverage and is used only to flavor soft drinks cannot serve to defeat that purpose. In its condition, as imported, it has a substantial

alcoholic content and is a product of distillation. We therefore hold that it is subject to internal revenue tax as assessed and overrule plaintiff's claim.

It would appear, therefore, that the court, in the *Polak & Schwarz* case, *supra,* disregarded the fact that the commodity there involved was not used as a beverage and held that such fact could not serve to defeat the purpose of the internal revenue law which was to impose a tax on all products of distillation which contained distilled spirits or alcohol. In our opinion, the situation in the case at bar parallels that which obtained in the case above cited.

On the basis of the record here presented and for the reasons heretofore stated, we hold the involved merchandise properly dutiable under paragraph 24 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of 7½ cents per pound and 9 per centum ad valorem as fruit flavoring extracts, containing not over 20 per centum of alcohol, and, in addition, the said merchandise is subject to an internal revenue tax under the provisions of section 5001 of the Internal Revenue Code of 1954 at the rate of $10.50 per wine gallon, as assessed.

Judgment will be entered accordingly.